By the Court.—Sedgwick, J.
An outline of the case is that the plaintiff, and others, were the owners of a quantity of the shares of the stock of the Long Island Railroad Company. The defendants owned and controlled another quantity of that stock. The plaintiff and her associates, acting by an agent, and the defendants agreed that neither quantity of stock should be sold, unless it was in a sale that included the other quantity, and the defendants then authorized plaintiff’s agent to sell to Mr. Poppenhusen the stock which defendants owned and;' controlled, for seventy-five per cent, of its nominal value, and certain bonds owned by them for ninety per cent, of their amount, in cash, if Mr. Poppenhusen should put his offer to pay that in writing. The defendants further agreed that during the'negotiations for the sale, they would neither buy stock nor do anything else to interfere with the negotiations.
Plaintiff’s agent then began negotiations for a sale-on these terms. While they were on foot, the defendants had interviews with the executors of Mr. Charlick, to learn if they would be willing to sell to the defendants stock of the same railroad owned by the executors, *478 and on what terms. On December 2, the plaintiff’s agent wrote to the defendants, that Mr. Poppenhusen had declined the proposition for the sale of the stock and bonds, but had submitted5 one in return, which the agent did not submit to the defendants, for the reason that they had expressed no desire to entertain anything different from that agreed upon, viz.: cash. On December 11, the defendants bought from the executors of Charlick, their stock, at sixty-five per cent, of the nominal value. On December 14, the plaintiff ’ s agent, in ignorance of ,the purchase of the Charlick stock, obtained from the defendants leave to sell the stock in which plaintiff was interested, by itself, and proceeded to attempt to sell it without including defendants’ stock.
On January 26, 1875, the defendants sold to Mr. Poppenhusen the stock owned and controlled by them for seventy-five per cent, in cash. The plaintiff claimed that the purchase from Charlick’s executors and the sale to Mr. Poppenhusen, were violations of defendants’ obligations to plaintiff.
After all the evidence was in, the defendants’ counsel moved to dismiss, upon several grounds. One of them was that “even if the pretended agreement was made, continuing and valid, the purchase by the defendants of the Charlick stock on December 11 (the negotiation for a joint sale, pending on November 24, having ended on December 2), was not a breach of such agreement.” They also asked the court to charge, that 1 ‘ the evidence conclusively shows, that on or about December 14, 1875, and before the sale to Poppenhusen, which is complained of by the plaintiff, the plaintiff was by the consent of the defendants released from any further obligation, to hold her stock or keep it out of the market.”
A further request to charge was, that the conduct of the parties after" December 14, 1875, as established by *479 undisputed evidence on the part of the plaintiff and given by the witness, Parsons, is inconsistent with the theory, that after that date there was any binding contract or obligation in force between the parties. They also asked the court to charge, that “ the purchase by the defendants, at the time and under the circumstances given in evidence, of the stock known as the Charlick stock, was not a breach of any contract established by the evidence to have been made at any time between the plaintiff and the defendants also, that “ upon the whole case, the defendants are entitled to a verdict.”
Beyond controversy, the complaint does not set out any contract of which the purchase of the Char-lick stock was a breach.
The court instructed the jury to find whether the parties, before April, made any arrangement with a provision “ that neither lot of stock should be sold without-including the other,” and whether this agreement “was renewed in the fall of 1875;” “and a further agreement then made, that if a sale could be effected at seventy-live cents on the dollar, the defendants would include the Albert Havemeyer stock, and the stock which they owned and controlled, and that the xiegotiation for such sale should be put in the hands of Harry O. Havemeyer, with a further provision that during the negotiation, the defendants should neither buy stock nor do anything else to interfere with negotiation.”
Of course, the purchase of the Charlick stock did not violate the provision, “ that neither lot of stock should be sold without the other.” Was it a violation of the other provision, that “during the negotiation the defendants should neither bay stock nor do any- • thing else to interfere with the negotiations ?” By the charge (and upon it the jury found for the plaintiff), the negotiations, during which the defendants agreed not to buy stock and not to do anything to interfere *480 with negotiations, were “the negotiations for such sale.” The sale referred, to was one to be made for cash, at seventy-five per cent, for the stock, and ninety per cent, for the bonds, if a written proposition to buy on those terms should be made by Mr. Poppenhusen. The evidence shows that such was the sale, although the charge refers to it as a sale for seventy-five per cent, for the stock alone. The evidence, by the construction most favorable to plaintiff, shows that defendants’ promise referred only to negotiations for a sale of the kind that has been described. The witness, on this point, for plaintiff, was her agent, and he testified: “I told John . . I wanted him to. state again that he would sell her stock at seventy-five cents, and his bonds at ninety cents, and I wanted also his brother Henry to say so ; that the negotiations had reached a point where they were to be consummated.” After testifying to defendants’ consent to this, he continued, “ that they must neither buy nor sell, that the position must remain exactly as it was, as in the event of its not being sold, the position was to remain unchanged.”
It should be here observed, that the complaint did not state or base any claim, upon an agreement “that the position was to remain unchanged.” The plaintiff on the trial did not make any claim upon it; nor did the charge of the court leave it to the jury, or in any way refer to it. Its significance here, is to show, that the negotiations referred to were those for the specific sale mentioned in the testimony.
The witness proceeded to say, “I recall that John stated, ‘ Suppose you cannot get the price; suppose that negotiations fall through,’ and I stated then the affair is to remain as it was, until some new arrangement is made.”
The testimony of the witness on another trial, read on this was, “ I stated to John, that my negotiations for obtaining a bid for seventy-five for the stock, and ninety *481 for the bonds would probably be successful, and, in connection with that,” John C. Havemeyer said that, pending the negotiations with Messrs. Poppenhusen, they would have no transactions in the stock in any way, shape or manner; neither buy nor sell, nor do anything to depreciate; I stated the same, that I did not wish to have anything transpire that would interrupt the negotiations.”
The next question is, did the evidence incontrovertibly show that the negotiations had ended, before the defendant bought the Charlick stock on December 11. On December 2, the witness wrote to the defendant this letter. “ Dear sir : The proposition for the sale of the Long Island stock and bonds to Mr. Poppenhusen has been declined by him, and he has submitted one in return, which I have not submitted to you, for the reason that you expressed no desire to entertain anything different from that agreed upon, viz: cash.” It must be seen, that the defendants were notified, that the negotiation for seventy-five cents for the stock, and ninety cents for the bonds in cash, had been ended by Mr. Poppenhusen declining to make the purchase, and making a counter proposition, which plaintiff’s agent did not think worth while even to describe to the defendants.
The letter gives no intimation to the defendants, that the agent was about to go on with negotiations. If he did so, they were new negotiations, for himself, and not authorized by defendant. There is no proof that before December 11, he ever informed defendants that he was continuing negotiations with Mr. Poppenhusen. He testified that he had one interview with the defendants between November 24 and December 14. He dbes not fix the date of this interview, or describe its contents, so that it would appear to refer to negotiations after December 2. On the other hand, his testimony was, that it might have occurred on the Monday after *482 November 24. If there were in fact any negotiations of any kind, after December 2, there was no testimony that they were for a sale on the terms prescribed by «defendants, for, whenever the negotiations took place, the only testimony as to their character was such as •could be inferred from their consummation, viz., a written offer by Mr. Poppenhusen to buy on terms, which had not been acceded to, and which the defendants were not bound to accept as the court upon the trial charged. In this way it appeared on the trial by evidence, against which the jury could not find, that the negotiations referred to in the promise, had ended on December 2, and also that the agent of plaintiff had informed the defendants and led them to believe that they had ended. From this time, the defendants were not bound by any agreement to refrain from buying stock.
There was no proof that the purchase of the Char-lick stock, or the bargaining with the Charlick executors for its purchase “ interfered with the negotiation,” to use the words of this charge. No proof was given on the subject. Least of all, was there anything tending to show that this purchase or bargaining had the effect of influencing Mr. Poppenhusen to decline the defendant’s terms. If this had been a ground of a recovery by plaintiff, it would have been necessary to tell the jury that the plaintiff could recover for such damages only as the evidence showed she had suffered from that breach. The damages would have been proportioned to the proved effect of the breach.
Moreover, if the liability of defendant arose from their having “interfered with the negotiations,” the just conclusion from the evidence is that the conduct of plaintiff’s agent was such that the agreement on this point ceased to be binding upon the defendants before any alleged breach by defendants. On the day of the alleged agreement, and before it was made, the *483 plaintiff’s agent wrote to Mr. Poppenhusen the letter of November 94, and also received an answer to it. The defendants made the agreement in ignorance of these letters.
The agent of plaintiff testified that that part of the letter which stated “ I cannot commit myself just yet,” referred to his being at that present time bound to sell the stock, inrespect of which he was agent, with the defendants’ stock, and not separately, and that he wrote the letter from a fear that the defendants would be treacherous, and would endeavor to sell their stock apart from plaintiff’s stock. Whatever was the1 motive, and if good or otherwise, the letter informed Mr. Poppenhusen that in case the plaintiff’s agent ceased to be committed, he would sell to Mr. Poppenhusen the large amount of stock he controlled, which was, in fact, about one-third of a majority of the stock, and would assist him in getting enough besides to make a majority, and would act against “those in control,” which phrase included»the defendants. He knew the fact, that it was in Mr. Poppenhusen’s power to release him from his committal to defendants, by refusing to buy on the terms which defendants had prescribed, and whicli he Avas about to present. He thus influenced Mr. Poppenhusen’s mind against agreeing to defendants’ proposition. He presented a motive that was unfavorable to deféndants, and Mr. Poppenhusen’s answer, that if necessary he would act upon the kind offer, shows the effect.
In substance, the agreement of defendants to allow the plaintiff’s agent to negotiate for a sale of defendants’ stock, was, as argued by the counsel for defendants upon the trial, “a mere authority to Henry O. Havemeyer.” Its tenor professed or purported no more. There was no antecedent obligation of defendants to sell their stock, or to place it in the hands of plaintiff’s agent for sale. The plaintiffs agent or the plaintiff *484 had no interest in the subject matter of the authority ; that is, the defendants’ property. In this way the plaintiff’s agent became defendants’ agent to negotiate, and was bound to the utmost fidelity to defendants, and could not rightfully continue to be agent after a violation of any of his obligation. The plaintiff was bóund by his acts.
If the arrangement be considered as an agreement, its promises were mutual. The letter referred to was a first violation of the agreement, and was such a breach that, thereafter, the agreement came to an end, and therefore the defendants ceased to be bound by it. Or if it be considered only as an authority to an agent, his violation of his duty as agent terminated his power to bind his principal, or to continue to act for him.
It was suggested that, as the letter was sent and answered before the arrangement of November 24, it could not be a violation of the agreement then made. But the effect was operative, after the negotiation began, as the answer to the letter shows. It is for the effect that there was responsibility. The offer contained in the letter was not withdrawn, but, as it contemplated, remained in the hands of Mr. Poppenhusen, to await the result of the negotiation of defendants’ proposition.
After the arrangement in respect of the sale, on defendants’ terms, ceased to bind the defendants of the so-called agreement, remained only the provision that neither lot of stock should be sold without the other. This did not forbid any purchase that either party chose to make. Either party might bring it to an end at pleasure, before a breach. Giving to it the greatest force that can be claimed for it, either party could end it by notice. Its benefit to the parties was, that it tended to give an opportunity for the sale of the two lots of stock together ; but it did not bind either party to make a sale. Either party- could obtain the power *485 to sell separately, by a notice ending the agreement. Without going into the question of whether the arrangement possessed the constituents necessary by law to a contract, or, particularly, of whether there was sufficient consideration, it will not be doubted that the only consideration that sustained the contract was the mutual promise not to sell separately. When the promise ceased to be mutual, the contract ceased. By the undisputed testimony, plaintiff’s agent had failed to bring about any arrangement which could include defendants’ stock, upon the terms which the defendants rightfully demanded. There was no prospect of future co-operation. All efforts had been exhausted. On December 15, the agent acting for plaintiff asked defendants if he were at liberty to sell, separately, the stock he acted for. The defendants, by assenting, gave the liberty. This was nothing else than an annulling of plaintiff’s promise, which was the consideration to 'defendants. It, in. fact, annulled the agreement, for that was a mutual promise. It was not less than a notice by plaintiff that the mutual understanding was to end, and as to defendants, the parties to whom the notice was given, they might treat the agreement as then ended.
It was argued that such a construction should not be given, because, at the time, the plaintiff’s agent did not know that the defendants had bought the Charlick stock. It cannot, however, be inferred that, if he had known it, it would have made him the less desirous to have the power of acting apart from the defendants. But, without going further in this direction, it is sufficient to say that, from views already expressed, it results that the defendants were under no obligation to inform plaintiff’s agent of the Charlick purchase. After plaintiff’s agent had received permission to sell her stock, he attempted to sell it by a negotiation, and in a manner that was inconsistent with the exist *486 ence of an agreement, that the two parcels of stock should not be sold separately. As the agreement came to an end on December 14, the defendants could rightfully sell, on January 27, ■ to Mr. Poppenhusen, their own stock, without including the plaintiff’s.
I am further of opinion, that the court should have charged, as requested by defendants’ counsel, that “in estimating damages, the jury cannot take into account any mere chance of making uncertain profits, nor any speculative value arising from or depending upon the possibility of the plaintiff combining her stock with that of other persons.”
The court charged, in accordance with the former decision of the general term, that the measure of damages would be the amount in which the market value of the plaintiff’s stock was lessened by a breach of the contract by defendants. The general term expressed the opinion that the defendants’ sale to Poppenhusen was some evidence of market value. And on this trial the court said to the jury : “ The measure of damages for a breach by defendants of this contract, if there was such an agreement, would be the amount of any depreciation, in the fair cash and market value of the plaintiff’s stock, occasioned by the breach. You are to determine, from the evidence, what was the market value at that time, and you are at liberty in this connection to consider the price paid by Poppenhusen, as bearing upon that subject. ' You are not, however, concluded by such a price in estimating the value, but you may consider it, in connection with the other evidence on this subject.” It stood then, in this wise: the jury was charged that they might find, if the evidence justified it, that the sale to Poppenhusen ivas a breach; that they must find what was the market value before the breach, taking as some evidence the price paid by Poppenhusen, and then what the market value was after the breach.
*487 This sale, as some evidence of market value, was evidently of serious practical importance. It had a tendency to increase the amount of damages to the extent that the price paid represented in the minds of the jury—real market value. If that price paid was, in fact, above market value, the jury should have disregarded the excess. If there were facts tending to show that this sale was brought about by considerations on the part of Poppenhusen, which could not have influenced the market generally, the jury should have taken those facts, in connection with their conclusion from the evidence, as to the probability of the plaintiff having been able to make a sale, of a kind like the one to Poppenhusen. The jury should have found whether it was probable that the plaintiff, or those associated with her, could have procured a sufficient amount of the stock to be a majority of the stock ; and also to what extent the price given by Poppenhusen was influenced by the sale being of a majority. If the evidence satisfied the jury that Poppenhusen would not have paid the price he did, unless for a majority of the stock, and it was only possible that the plaintiff could have procured a majority, or her chance to do it was only speculative, the jury, in using the sale as evidence, should not have enhanced the market value by such part of the price paid, as came from the fact that a majority was sold. In other words, to the extent that it was only possible or speculative whether the plaintiff could have made a sale like the one to Poppenhusen, the jury should have disregarded the price paid by Poppenhusen.
Some facts that appeared in the case may be adduced here. The complaint stated that it was well known by the parties “that one Adolph Poppenhusen and others co-operating with him, desired to purchase a majority of the stock of the company, and that he would pay for a majority a much larger price than *488 after liis purchase could be obtained for the other stock,” and further, “that by the action of the defendants, the Albert Havemeyer stock has been placed in a minority of the stock of the company and its market value has been made worth, not to exceed twenty per cent, of its par value, instead of seventy-five per cent., at which it could have been sold if the defendants had not been guilty, &c.” The plaintiff’s agent' gave testimony of the market value before the agreement which was applicable by the jury to the time immediately before the breach. He testified that he told the defendants, that without a combination, there was no market value for the stock ; and again, that there was no market for it, unless it was combined with enough- of the stock to form a majority ; and. again, that a majority of the entire road could be sold and thereby bring a higher price.
There was, therefore, some evidence for the jury, that to get the price afterwards paid by Poppenhusen it was necessary to secure control of a majority, and it would have been a substantial aid to the jury to instruct them, that the damages were not to be founded upon a speculative chance that the plaintiff might have been able to offer a majority for sale.
For these reasons I am of opinion that there should be a new trial.
Judgment reversed, and new trial with costs of the appeal to the appellant to abide the event.
Speir, J., concurred.